J-S85043-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN RE: A.A.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.M.B., NATURAL MOTHER | No. 1421 WDA 2017 |

Appeal from the Decree entered September 1, 2017
In the Court of Common Pleas of Blair County
Orphans' Court at No: 2017 AD 5

BEFORE:  BOWES, PANELLA, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                FILED  MARCH 5, 2018

B.M.B. (Mother) appeals from the amended decree entered September 1, 2017, which involuntarily terminated her parental rights to her minor son, A.A.F. (Child), born in January 2016.[1]  After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> . . . [Blair County Children, Youth and Families (BCCYF)] was granted verbal emergency protective custody of the subject child by the undersigned on May 4, 2016.  [BCCYF] filed an Application for Emergency Protective Custody and a Shelter Care Application. In the Order for Emergency Protective Custody entered May 5, 2016, BCCYF was granted custody, including right of placement. BCCYF filed both applications based upon reports that the Mother had not been bonding with the child since birth; that the child had

_____

[1] The decree also terminated the parental rights of Child's father, P.A.F. (Father).  Father filed an appeal at Superior Court Docket No. 1482 WDA 2017, which we address in a separate memorandum.

developmental delays; that the Mother was not following through with recommendations of in-home service providers regarding the child not meeting developmental milestones; that the Mother had intellectual limitations and mental health concerns but was not taking her prescribed medication; and that the parents would not allow the child to be assessed for Early Intervention despite a referral by the service provider. On May 4, 2016, the date the emergency verbal order was given, BCCYF caseworkers went to the family residence and observed the Mother holding the young child inappropriately; that the child's head was significantly flat; that the child was not responding when they tried to interact with him; and the Mother was unable to identify the child's primary care physician. Furthermore, they observed that the downstairs of the residence was cluttered with construction tools and that the Mother's bedroom was cluttered with pill bottles and an old bottle of baby formula on the floor. There was also an individual residing in the home with an active arrest warrant.

After the Shelter Care hearing held May 6, 2016 before Hearing Officer James V. McGough, Esquire, a Shelter Care Order was entered on May 10, 2016 returning legal and physical custody of the child to the Father and directing BCCYF to provide general protective services. [BCCYF] was to make an immediate referral for family preservation services; and the parents were directed to cooperate with services through Home Nursing Agency Nurse Family Partnership, the WIC Program and any recommendations made by the pediatrician. Further, both parents were directed to cooperate with an Early Intervention Assessment for the child and cooperate with any recommended services.

Upon request of [BCCYF], a Shelter Care Rehearing was held on May 11, 2016 before the undersigned, at which time the record from the original shelter care hearing held May 6, 2016 was incorporated. Legal and physical custody was vested in both parents with the child to remain under the protective supervision of [BCCYF]. Both parents were again directed to cooperate with all recommended services, and the Mother was specifically directed to engage in mental health counseling and follow all treatment recommendations, including taking her medication as prescribed.

On May 6, 2016, BCCYF filed a Dependency Petition and a Motion for Finding of Aggravated Circumstances alleged as to the Father, based upon the fact that his parental rights had previously been involuntarily terminated relative to another child. After

- 2 -

hearings held May 11, July 26 and August 11, 2016, we entered an Order of Adjudication and Disposition on August 18, 2016 finding the subject child to be dependent. The record from these three proceedings was quite extensive. To summarize the several bases for a finding of dependency, such would include the Mother's significant mental issues which affected her bonding and attachment with the child; the developmental delays for the child which were discussed with the parents; the parents consistently placing a blanket or other items in the baby's crib which created safety concerns; the parents['] refusal to follow through with recommended services for Early Intervention and the Parents as Teachers Program; unknown people coming in and out of the home while service providers were present; inappropriate behavior by D.F., the paternal grandfather, who has his own mental health issues; the parents' difficulty in establishing a daily schedule and routine for their child; resistance; anger and hostility by the Father toward service providers; the Father's refusal to undergo a mental health evaluation even though he had been previously diagnosed with a bipolar condition; the conflict between the parents, including yelling and screaming in the presence of child; the parents' inability to attend to the basic necessities for the child; the lack of cooperation and progress with service providers; and each service provider testifying that they could not ensure the safety of the child within the parents' home. Based upon the evidence adduced during these hearings, we granted BCCYF legal and physical custody of the child and placed the child in a foster home. We also granted [BCCYF's] Motion for Aggravated Circumstances against the Father due to an involuntary termination of his parental rights relative to another child . . . .

Trial Court Opinion, 10/12/17, at 5-8 (emphasis omitted).

On January 18, 2017, the trial court entered a permanency review order changing Child's permanent placement goal from return to parent or guardian to adoption, and relieving BCCYF of its obligation to provide reunification efforts. Mother appealed, and a prior panel of this Court affirmed on July 19, 2017. In the Interest of A.F., 2017 Pa. Super. Unpub. LEXIS 2744, 2017 WL 3050322 (Pa. Super. filed July 19, 2017) (unpublished memorandum).

On February 16, 2017, BCCYF filed a petition to involuntarily terminate Mother's parental rights to Child. The trial court conducted a termination hearing on August 29, 2017. Following the hearing, on August 31, 2017, the court entered a decree terminating Mother's parental rights. The court entered an amended decree on September 1, 2017.[2] Mother timely filed a notice of appeal on September 29, 2017, along with a concise statement of errors complained of on appeal.

Mother now raises the following issue for our review: "Whether [BCCYF] met its burden of terminating Mother's parental rights by clear and convincing evidence[?]" Mother's Brief at 4.

We review Mother's issue mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[2] The original decree included two grounds for terminating Mother's parental rights, with the trial court adding a third ground in pen. The amended decree included all three grounds.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), appeal denied, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows.

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2). In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Mother is incapable of parenting Child, and that she cannot, or will not, remedy her parental incapacity. Trial Court Opinion, 10/12/17, at 19. The court reasoned that Mother failed to engage consistently in mental health treatment, failed to take her medication as prescribed, and refused to cooperate with an assessment by Early Invention Services and the Parents as Teachers Program. Id. The court further reasoned that Mother's visits with Child remain supervised, due to persistent safety concerns. Id. The court expressed concern that Mother continues to reside with Child's paternal grandfather, who suffers from his own mental health issues. Id.

In her brief, Mother presents a single argument section in which she appears to challenge both Section 2511(a) and (b). With respect to Section 2511(a), Mother argues that the trial court changed Child's permanent placement goal to adoption shortly after she began working with service providers, such that the court "was not able to determine if the services provided to Mother would have allowed her to gain the functioning necessary to provide for the child." Mother's Brief at 10.

Our review of the record supports the trial court's decision. During the termination hearing, the court incorporated by reference Child's prior dependency proceedings, including a report prepared by psychologist, Terry O'Hara, Ph.D., in October 2016. See Petitioner's Exhibit 1 (Psychological Evaluation Report). In his report, Dr. O'Hara explained that he conducted a global assessment of Mother, which revealed a variety of significant parenting

concerns. Id. at 21-25. Dr. O'Hara concluded that Child would be at risk for "neglect, abuse, exposure to domestic violence and psychological instability, depression, anxiety, truncation of appropriate development, and reactive attachment disorder" if he were returned to Mother's home. Id. at 24-25.

In reaching this conclusion, Dr. O'Hara placed particular emphasis on Mother's intellectual limitations. Dr. O'Hara explained that he subjected Mother to a series of psychological tests, which revealed that she has a "2.6 word reading grade level" and a "2.8 grade level in sentence comprehension." Id. at 9. Because of Mother's limited reading abilities, Dr. O'Hara was unable to administer several other tests. Id. at 5. Dr. O'Hara assessed Mother as having an IQ of sixty-seven, placing her in the first percentile for her age, and indicating that she is intellectually disabled. Id. at 9.

Concerning the practical impact of Mother's intellectual limitations, Dr. O'Hara reviewed an evaluation from Mother's former school, which indicated that she "'had difficulty following her class schedule and opening her locker . . . when called to the principal's office, [Mother] needed to be escorted so she would not get lost.'" Id. at 2. During his own evaluation, Dr. O'Hara observed that Mother "frequently paused before responding to questions from this examiner and took several minutes to print and sign her name after this examiner explained the consent form." Id. at 5. Mother also "asked this examiner the time and indicated that she is unable to tell time on a clock." Id. at 11.

In addition, Dr. O'Hara emphasized that Mother suffers from significant mental health issues. During the evaluation, Mother reported that she is sad and depressed every day, and that she is irritable "every day . . . all day until nighttime." Id. at 6. Mother reported that she is prescribed an antidepressant, and that when she does not take it she "snap[s] out." Id. at 5-6. Mother also admitted to engaging in self-harm behavior. Mother stated that she intentionally burned herself with a cigarette in September 2016, and that she punched herself in the stomach while she was pregnant with Child, although she "later indicated that she was not trying to harm the baby." Id. at 6-7.

Importantly, the testimony presented during the termination hearing indicates that Mother has failed to address her mental health needs on a consistent basis. Mother's Home Nursing Agency case manager, Jessalynn Garlena, testified that Mother receives medication management and outpatient counseling. N.T., 8/29/17, at 26-28, 33. However, Mother has canceled or rescheduled several medication management appointments, and she has not attended outpatient counseling "in quite some time." Id. at 26-27. Ms. Garlena also referred Mother to North Star Services for assistance in learning life skills in April 2017. Id. at 28-29. North Star Services was unable to begin working with Mother until August 2017, because they "were struggling to get a hold" of her. Id. at 29.

In addition to Mother's intellectual limitations and mental health issues, the record reveals that she continues to live with Father, with whom she has

a tumultuous, and even violent, relationship. BCCYF caseworker, Ronna Holliday, testified that Father contacted BCCYF prior to Child's adjudication of dependency, and informed them that he had broken up with Mother and that she had moved out of the house. Id. at 64. Mother later alleged that Father and his cousin had been physically and emotionally abusive to her.[3] Id. More recently, in July 2017, Father called BCCYF stating that he and Mother had been in an argument and that he "had to go to the hospital" because Mother "may have broken his toe." Id. at 61.

Mother also continues to reside with Child's paternal grandfather, D.F. Id. at 39. The record reveals that D.F. suffers from his own significant mental health issues. Id. at 40. Ms. Holliday explained, "I've tried to have conversations with him. He talks about the war. He talks about the military and we were informed by [Father] that he was never enrolled in the military." Id. Mother herself testified that she and Father "tried to like get a court order for [D.F.] to get back on his medication," but that D.F. is not dangerous and "just has fantasy details in his mind and, you know, . . . everyone goes through that." Id. at 88, 100.

Thus, the record supports the trial court's conclusion that Mother is incapable of parenting Child, and that she cannot, or will not, remedy her parental incapacity. Mother suffers from significant intellectual limitations, and she has failed to address her mental health issues consistently. Moreover,

_____

[3] Mother recanted these allegations. Petitioner's Exhibit 1, at 5; N.T., 8/29/17, at 104.

Mother continues to reside with Father and D.F., despite her tumultuous relationship with Father and D.F.'s obvious mental instability. When considered together, these issues confirm that Mother cannot provide the safe, stable, and nurturing environment that Child needs. Moreover, contrary to her argument on appeal, it is clear that additional services would not have allowed Mother to remedy these issues within a reasonable period of time.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

- 11 -

In its opinion, the trial court summarized the testimony presented by BCCYF, including testimony that Child "demonstrated an attachment" to Mother during their visits together, but that Child also has a very strong bond with his foster mother. Trial Court Opinion, 10/12/17, at 15-16. Ultimately, the court concluded that terminating Mother's parental rights would best serve Child's needs and welfare, "so as to allow this child to achieve safety and permanency . . . ." Id. at 19.

In response, Mother argues that she attended the majority of her visits with Child, that her interactions with Child were appropriate, and that she and Child share a bond. Mother's Brief at 10.

Our review of the record again supports the trial court's decision. During the termination hearing, Child's visitation supervisor, Alexis Richards, testified that Child and Mother have "a good bond," and that Child becomes upset if Mother leaves the room during visits. N.T., 8/29/17, at 20-21. At the conclusion of his most recent visit with Mother, Child "cried a little when he had to leave and wanted to hold onto [Mother]." Id. at 17. However, Ms. Richards qualified her testimony by stating that Child behaves similarly toward any "female figure" that he sees. Id. at 16. She explained, "we've had our secretary walk in to give us a note or something and when she walks out, even though she's only been in there for like two minutes maybe, he'll cry then too." Id. at 21.

In addition, Ms. Richards testified that Child has a "very good bond" with his foster mother. Id. at 14. When Ms. Richards picks up Child for visits, he

is often "very upset" to leave his foster mother. Id. at 14. When Ms. Richards returns Child to his foster mother after visits, his arms "reach out to her immediately." Id. Ms. Richards described a recent visit during which Child was in a room with Mother, Father, and his foster mother all at the same time. Id. She recalled that Child "was more towards [his foster mother]. He wanted to go towards [his foster mother] more than he wanted to be with bio mom or dad." Id.

Similarly, Ms. Holliday testified that Child appears bonded with his foster parents and their biological children, and is comfortable in the foster home.

> [Child] looks to the children, the biological children in this family for his needs and wants. They enjoy -- he enjoys playing with them. They enjoy playing with each other. They have a family dog that is -- he is very close with. He really enjoys being with the dog. Even with the adoptive resource father, he came in from work one day and [Child] got very excited. He was dancing. When he sat down [Child] sat with him and he stayed at his side for several minutes and then played right in front of him for the rest of the visit. The adoptive resource family has integrated him into their daily life. He's happy to see them. When I'm there he looks to them for security. Eventually he has warmed up to me and come to me but he knows that -- he seems to have -- there is a safety protectiveness [sic] with the adoptive resource family I should say. He is very comfortable in the home.

Id. at 50-51.

Thus, it is clear that terminating Mother's parental rights would best serve Child's needs and welfare. Child's behavior indicates that he shares a bond with Mother. However, the strength of this bond is questionable, given that Child behaves in a similar fashion toward complete strangers. Moreover, Child displays a strong bond with his foster parents, and they have integrated

him fully into their family.  Mother remains unable to care for Child, and preserving her parental rights would serve only to deny Child the benefits of a permanent, safe, and stable home.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child. Therefore, we affirm the court's September 1, 2017 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/5/2017